**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Todd ASTILLERO.**

Superior Court of Pennsylvania.

Submitted Oct. 4, 2011.
Filed Jan. 31, 2012.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Karl Baker, Public Defender, Philadelphia, for appellee.

Before: STEVENS, P.J., FORD ELLIOTT, P.J.E., and GANTMAN, J.

OPINION BY FORD ELLIOTT, P.J.E.:

■ This is an appeal by the Commonwealth from an order granting appellee Todd Astillero's motion to suppress.[1] For the reasons discussed below, we reverse and remand for trial.

The facts of this case, as stated by the suppression court, are as follows:

1. In response to the motion to suppress, the Commonwealth called Philadelphia Police Officer Steven Wheeler as its first witness (*Suppression Hearing, N.T., February 2, 2010; p. 3–14*).

2. Officer Wheeler testified that on March 17, 2009, at approximately 11:45 P.M., he was on duty as a Philadelphia Police Officer, working with Police Officer Jonathan Czapore (*Suppression Hearing, N.T., February 2, 2010; p. 3*).

3. At that time, Officer Wheeler and Officer Czapore were assigned to the 25th Police District Narcotics Enforcement Team. Office[sic] Wheeler testified at as of that date, he had been working on that unit for the past seven (7) years and had during that time conducted between 500–750 surveillances. A "large number" of these surveillances have

---

1. The Commonwealth has attached a signed certification to its notice of appeal in which it notes that the trial court's order will substantially handicap the prosecution. Thus, this appeal is properly before this court. *See* Pa. R.A.P., Rule 311(d), 42 Pa.C.S.A.; *Commonwealth v. Moyer*, 954 A.2d 659, 661 n. 1 (Pa.Super.2008), *appeal denied*, 600 Pa. 754, 966 A.2d 571 (2009).

resulted in arrests (*Suppression Hearing, N.T., February 2, 2010; p. 3–4*).

4. On March 17, 2009, Police Officer Wheeler and his partner were conducting narcotics surveillance of Front and Clearfield Streets which is located within the city and county of Philadelphia, a location in which a police supervisor had assigned them to observe. According to Officer Wheeler, Front and Clearfield Streets is a residential area with a "Chinese store" located on the southeast corner of the location, and a grocery store located on the northwest corner. According to Officer Wheeler, the area of Front and Clearfield Streets is "known for the sale of PCP and marijuana" (*Suppression Hearing, N.T., February 2, 2010; p. 5*).

5. Office [sic] Wheeler testified that he observed Defendant Astillero with another black male who was never identified by the police, standing in front of the Chinese store located on the southeast corner of Front and Clearfield Streets. On three separate occasions he observed the unidentified black male escort individuals to 100 East Clearfield Street. The unidentified black male would then, "engage in a transaction with these persons from his person to theirs. He would hand them a small item in return for United States Currency" (*Suppression Hearing, N.T., February 2, 2010; p. 8*).

6. Officer Wheeler observed three separate "transactions" of the nature previously described. While the unidentified black male would be engaged in these several "transactions" Officer Wheeler observed Defendant Astillero standing "on the corner looking up and down the street" (*Suppression Hearing, N.T., February 2, 2010; p. 8*).

7. According to Officer Wheeler, during the surveillance he observed a police car passing by and Defendant Astillero "alerted" the other male by saying "Yo, yo" (*Suppression Hearing, N.T., February 2, 2010; p. 8*). He also testified that during his surveillance, he did not observe the other male ever hand anything to Defendant Astillero at any time (*Suppression Hearing, N.T., February 2, 2010; p. 14*).

8. At 11:45 PM, Officer Wheeler gave a description of Defendant Astillero and the other male. Later Officer Wheeler identified Defendant Astillero as the person he had seen during his surveillance (*Suppression Hearing, N.T., February 2, 2010; p. 13*).

9. Police Officer Jonathan Czapore testified that on March 17, 2009, at 11:45 pm he was working in plainclothes in an unmarked vehicle with his partner Police Officer Mario DiLaurentis assigned to the Narcotics Enforcement Team serving as backup unit to Officer Wheeler. At that time he received information that led him to stop Defendant Astillero. Specifically, he received information from Officer Wheeler via police radio to locate and stop two black males, "one black male skinny with a black vest, black hoodie and black pants walking along with a heavy set black male wearing a black jacket and pink cargo pants" (*Suppression Hearing, N.T., February 2, 2010; p. 16*).

10. Officer Czapore testified that upon spotting Defendant Astillero and another black male near 100 block

of Lippincott Street, the officer "exited the front passenger seat of the unmarked vehicle and immediately identified myself as a police officer verbally and by showing a badge. At this time, the skinnier Black male began to run, immediately after I identified myself, westbound on Lippencott Street. This defendant I observed pull a black handgun out of his front right jacket pocket. I was close enough to where I was able to tackle this defendant. We both fell to the ground. Him first. I was on top of him. His arm immediately went with a handgun underneath of a parked car" (*Suppression Hearing, N.T., February 2, 2010; p. 16*).

11. Defendant Astillero and Office [sic] Czapore struggled on the ground with Astillero being tasered before "he complied by pulling out his arm from underneath that vehicle" (*Suppression Hearing, N.T., February 2, 2010; p. 17*).

12. Police Officer DiLaurentis eventually retrieved a firearm from underneath a vehicle (*Suppression Hearing, N.T., February 2, 2010; p. 17*).

13. Defendant Astillero testified in his own behalf. Defendant testified that on the date in question he was present at Front and Clearfield Street at approximately 11:30 pm accompanying his friends to "the store to purchase some things" (*Suppression Hearing, N.T., February 2, 2010; p. 22*). After leaving the store he, along with his friends, walked to his godsister's home. He never made it there because as they were walking back "a tan unmarked car" appeared and stopped beside Defendant Astillero. A police officer got out of the car and said "Freeze. Philadelphia police. Get the "F" on the ground." Defendant testified that he complied with the police command and got on the ground. While he was on the ground, the police officer stood over him and searched him by going into his pockets. The officer then pressed him down on the ground and spread his arms out. Another officer asked "Did you find anything on him yet?" To which the first officer responded, "No. Check under the car. It might be something under the car." (*Suppression Hearing, N.T., February 2, 2010; p. 23*).

14. Defendant further testified that he was not "out there selling drugs." Nor was he in possession of a firearm. The friend that he had been walking with "ran off." Defendant last observed him running in between two parked cars, one of which the gun was recovered from underneath. (*Suppression Hearing, N.T., February 2, 2010; p. 23*).

15. At the culmination of the testimony presented, this Court granted the defendant's motion stating "I'm going to grant the motion because Commonwealth vs. Weil states that the reasonableness of suspicion for an investigatory stop must be commenced by what the officers observed before they conducted the stop or search. In this case there were allegedly three buyers, which we don't even know if they were buyers or not, because no one ever stops at least one buyer to ascertain that this could have been a drug transaction in action before moving forward. So I don't think it was enough to give rise to rea-

sonable suspicion. I grant the motion to suppress." (*Suppression Hearing, N.T., February 2, 2010; p. 31* ).

Suppression court opinion, 9/28/10 at 2–6.

We note at the outset that the suppression court made no explicit finding of fact in terms of the credibility of any of the witnesses, either at the motion hearing, in its order granting suppression, or in its Pa.R.A.P., Rule 1925(a), 42 Pa.C.S.A., opinion.

Appellee made an oral motion to suppress the firearm retrieved by police.[2] The Honorable Paula Patrick held a hearing on February 2, 2010, and granted the motion. Instantly, the Commonwealth presents the following issues for appeal:

1. Should this matter be remanded for the suppression court to issue findings of fact in compliance with [Pa. R.Crim.P., Rule] 581(I)[, 42 Pa. C.S.A.]

2. Did the lower court err in suppressing a gun that [appellee] attempted to pull on police when they approached him and identified themselves?

Commonwealth's brief at 3.

We may resolve these issues together. Our standard of review in an appeal from the granting of a suppression motion is well established:

This Court is bound by those of the suppression court's factual findings which find support in the record, but we are not bound by the court's conclusions of law. When the suppression court's specific factual findings are unannounced, or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing suppression party (here, appellee) and the evidence of the other party (here, the prosecution) that, when read in the context of the entire record, remains uncontradicted.

*Commonwealth v. Millner*, 585 Pa. 237, 246, 888 A.2d 680, 685 (2005) (citations omitted).

In the present case, as noted above, the court below made no explicit finding of fact—orally, at the suppression hearing, in its order, or in its Rule 1925(a) opinion—in terms of the credibility of the witnesses, as required by Rule 581(I). The court failed to make these findings despite the fact that the testimony of the police and the testimony of appellee differ drastically. The Commonwealth, in its first issue for appeal, argues that because of this failure, the matter should be remanded to the lower court with instructions to make more precise findings of fact.

 Instantly, we need not remand for further findings of fact as to credibility because the trial court's findings of fact largely adopt Officer Wheeler's account of the initial observations. However, the trial court found that even accepting Officer Wheeler's description of events, the police effected an investigative detention of appellee without the reasonable suspicion required to do so. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Simply stated, we find that the police had more than enough suspicion to effect an investigative detention.

 In Pennsylvania, interactions between the police and members of the public are divided into three categories: 1) mere encounters, which are characterized by the fact that the suspect has no official compulsion to stop or respond to the police, and need not be supported by any

---

**2.** We note that although the criminal docket indicates that appellee filed an omnibus pre-

trial motion on June 19, 2009, no such motion is present in the certified record.

level of suspicion; 2) investigative detentions, in which suspects are required to stop and submit to a period of detention, but are not subject to such coercive conditions to qualify as an arrest, and must be supported by reasonable suspicion; and 3) arrests, or custodial detentions, which must be supported by probable cause. *Commonwealth v. Pakacki,* 587 Pa. 511, 518–519, 901 A.2d 983, 987 (2006). If a suspect is subjected to an investigative detention that is not supported by reasonable suspicion, and the suspect abandons a piece of evidence that is later recovered by the police, that evidence generally ought to be suppressed. *Commonwealth v. Matos,* 543 Pa. 449, 453, 672 A.2d 769, 771 (1996). If, however, an investigative detention was supported by reasonable suspicion, any evidence abandoned by the suspect cannot be suppressed. *Id.*

In *Commonwealth v. Thompson,* 604 Pa. 198, 985 A.2d 928 (2009), the following factors coalesced to form not merely reasonable suspicion, but probable cause itself: 1) a single transaction of currency for a small object; 2) that transpired at night; 3) in a high crime area known for the sale of drugs; 4) as witnessed by a police officer with extensive narcotics training. The *Thompson* court observed that the following factors were important to the analysis:

> The time is important; the street location is important; the use of a street for commercial transactions is important; the number of such transactions is important; the place where the small items were kept by one of the sellers is important; the movements and manners of the parties are important.

*Thompson,* 604 Pa. at 204–205, 985 A.2d at 932, quoting *Commonwealth v. Lawson,* 454 Pa. 23, 28, 309 A.2d 391, 394 (1973).

Instantly, appellee's accomplice made *three* transactions of currency for small objects, at night, in a high crime area known for the sale of drugs, as witnessed by a police officer with extensive experience in narcotic sales. That appellee was conspiring with this accomplice was demonstrated when appellee first appeared to behave as a look-out, and then was confirmed as such when appellee alerted the accomplice as to an approaching police car. The two of them then immediately left the area together. (Notes of testimony, 2/2/10 at 10.) We also find that appellee's alert to his accomplice as to the approaching police car directly raised the inference that the two were engaged in illegal activity.[3] Considering the factors in *Thompson* that resulted in a finding of probable cause, there is more than enough here to merit a finding of reasonable suspicion. Since the police had reasonable suspicion to make a *Terry* stop, we find that the suppression court improperly granted appellee's motion and we will reverse.

Order reversed. Case remanded for trial. Jurisdiction relinquished.

---

**3.** We are untroubled by the fact that some of the actions that led to a finding of reasonable suspicion were performed by the accomplice and not appellee. The two were clearly acting in concert and their actions are, therefore, attributable to each other.